255 F.Supp. 115 (1966)
Joseph Lee JONES and Barbara Jo Jones, Plaintiffs,
v.
ALFRED H. MAYER COMPANY, a corporation,
Alfred Realty Company, a corporation,
Paddock Country Club, Inc., a corporation,
Alfred H. Mayer, an individual and an officer of the above corporations, Defendants.
No. 65 C 301(3).
United States District Court E. D. Missouri, E. D.
May 18, 1966.
*116 *117 *118 Samuel H. Liberman, II, St. Louis, Mo., for plaintiffs.
Israel Treiman, Shifrin, Treiman, Agatstein & Schermer, St. Louis, Mo., for defendants.
REGAN, District Judge.
This matter is before the Court on defendants' motion to dismiss plaintiffs' first amended complaint. The action was brought by Joseph Lee Jones, a Negro, and his wife, both of whom are employed by the Veterans Administration, an agency of the United States Government. The injury alleged is the refusal of defendants to sell a house and lot to plaintiffs solely because of Jones' race, in alleged violation of plaintiffs' rights under Sections 1981, 1982, 1983 and 2000a, Title 42, U.S.C., Executive Order No. 11063, providing for Equal Opportunity in Housing, the Thirteenth and Fourteenth Amendments to the Constitution of the United States, Article I, Section 8, Clause 18, and Article VI of the Constitution of the United States. Plaintiffs assert jurisdiction in this court pursuant to Section 1983, 42 U.S.C. and Sections 1331, 1337 and 1343, Title 28, U.S.C.
For the purpose of the motion to dismiss, we take as true the facts well pleaded in the complaint. Bonnot v. Congress of Independent Unions, Local No. 14, 8 Cir., 331 F.2d 355.
Defendant, Alfred H. Mayer Company, a Missouri corporation, is engaged in the business of developing subdivisions, that is, buying and holding parcels of land in St. Louis County, Missouri, and building homes on this land to be resold to the public. Defendant, Alfred Realty Company, a Missouri corporation, is a real estate dealer which acts as the exclusive sales agent of the houses built by Alfred H. Mayer Company. Defendant Alfred H. Mayer owns a controlling interest in both corporations and is their managing officer. Defendant, Paddock Country Club, Inc., a Missouri corporation, is controlled by the other defendants "for the primary use and benefit of the people who will reside in the subdivision."
Defendants are alleged to be presently developing a subdivision in St. Louis County known as Paddock Woods. After plaintiffs inspected a display house on the site and determined that one style of home particularly suited their needs and was reasonably accessible to their places of employment, they sought to obtain additional information from defendants and offer to purchase such a home. Plaintiffs allege that they desire to purchase a Hyde-Park model home, which, according to defendants' promotion material, can be built and sold to purchasers for a total of $28,195, presumably inclusive of the lot in the subdivision on which the plaintiffs desired the home to be built. However, defendants, through their agents, informed plaintiffs of defendants' "general policy not to sell houses and lots to Negroes", and in effect "refused to consider plaintiffs' application to purchase a house and enter into a contract for the sale of a house and lot."
A substantial portion of the complaint is devoted to allegations concerning defendants' plans and intentions relating to the future development of Paddock Woods. Thus, it is alleged that Paddock Woods includes over 100 "projected" homes, that the opening of more plats in the subdivision is planned, that streets in the subdivision are presently being built by Alfred H. Mayer & Company *119 on land it owns (title to which will ultimately be transferred to a board of trustees to be formed by it), so that the "ultimate result" will be a suburban community of approximately 1,000 people "living in an area chosen by defendants for development, residing in homes designed and built by defendants, driving on streets build (sic) by defendants, playing golf on the nearby eighteen (18) hole golf course built by defendants for the convenience of residents (of this and other nearby subdivisions developed by defendants), and enjoying facilities of the nearby bath and tennis club which defendants plan to open for the exclusive use of the residents of Paddock Woods."
For the purpose of the motion to dismiss, we assume that but for the color of Mr. Jones' skin, defendants would have sold to plaintiffs the lot they desire and would have built for them thereon the style of home they selected.
Plaintiffs do not contend that every person who offers a home for sale has no right to refuse to sell his property on racially discriminatory grounds. The thrust of their complaint is that the developer of a private subdivision is in a different category, apparently because his activities are business in nature. In their brief filed in opposition to the motion to dismiss, plaintiffs state their theory thusly: "The basis of the cause of action set forth in Plaintiffs' First Amended Complaint is that Defendants are prevented by federal law from discriminating on the basis of race in refusing to sell lots and houses to negroes in the subdivision they are building in St. Louis County." Stated otherwise, the issue is whether the willful refusal of an owner of private property who is developing a private subdivision thereon to sell a part of his property to a Negro solely because of race entitles the person so discriminated against, under any presently applicable federal law, either to damages or to a mandatory injunction or both. Under the present state of the law, our answer must be in the negative.
The language of Sections 1981 and 1982, reciting certain rights of citizens of the United States (e. g. to purchase, sell, hold and convey real and personal property and to make and enforce contracts) is broad and general. The legal right to purchase property does not, however, carry with it a corresponding obligation on the part of the owner to enter into a contract of sale against his will.
It is now well settled that these civil rights statutes are directed toward governmental action. Hurd v. Hodge, 334 U.S. 24, 68 S.Ct. 847, 92 L.Ed. 1187; Buchanan v. Warley, 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149. In Buchanan, it was said, (245 U.S., l. c. 79, 38 S.Ct., l. c. 19.) "The Fourteenth Amendment and these statutes enacted in furtherance of its purpose operate to qualify and entitle a colored man to acquire property without state legislation discriminating against him solely because of color." A long line of cases makes it clear that Section 1983 (which alone of the civil rights statutes, other than the Civil Rights Act of 1964, provides for a right of action) may be resorted to only in situations where state action is involved. It is true, of course, that the concept of "state action" has been greatly expanded since the early Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, and that it is not limited to state legislation, but state action in some form there must be. And it is equally true that "[w]hat is `private' action and what is `state' action is not always easy to determine." Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373.
Mr. Justice Frankfurter in his concurring opinion in Terry v. Adams, 345 U.S. 461, 473, 73 S.Ct. 809, 815, 97 L.Ed. 1152, stated the concept in this fashion, "The vital requirement is State responsibilitythat somewhere, somehow, to some extent, there be an infusion of conduct by officials, panoplied with State power, into any scheme by which colored citizens are denied (civil) rights merely because they are colored."
Even Mr. Justice Douglas, from whose concurring opinions plaintiffs quote at length, is committed to the view that *120 "The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals." United States v. Williams, 341 U.S. 70, at 92, 71 S.Ct. 581, at 593, 95 L.Ed. 758. And as recently as March 28, 1966, in United States v. Guest, 86 S.Ct. 1170, the Supreme Court stated that such "has been the view of the Court from the beginning" and "[i]t remains the Court's view today." See also United States v. Price, 86 S.Ct. 1152, decided the same day as Guest.
Plaintiffs' protestations to the contrary, there must be some substantial involvement of the state or one acting under the color of its authority, even though such involvement of the state need not be either exclusive or direct. Involvement, however, there must be. See Wallach v. Cannon, 8 Cir., 357 F.2d 557, 561-562.
We have carefully read all of the forty or more cases cited by plaintiffs in support of their contention that they have a right of action against defendants under the existing civil rights statutes and the federal constitution. We find all such cases clearly distinguishable.
Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161, involved an effort to judicially enforce in state courts restrictive covenants which operated to prevent the occupancy and purchase of real property by Negroes. The restrictive covenants were contained in private contracts between private persons. The Supreme Court stated, "It cannot be doubted that among the civil rights intended to be protected from discriminatory state action by the Fourteenth Amendment are the rights to acquire, enjoy, own and dispose of property."
In Shelley, as in the other cases to which we have been cited, the key words are "state action". The court found the requisite state action in the participation of the state courts in the enforcement of the restrictive covenants. Said the court, 334 U.S., l. c. 19, 68 S.Ct., l. c. 845, "The undisputed facts disclose that petitioners were willing purchasers of properties upon which they desired to establish homes. The owners of the properties were willing sellers; and contracts of sale were accordingly consummated. It is clear that but for the active intervention of the state courts, supported by the full panoply of state power, petitioners would have been free to occupy the properties in question without restraint." (Emphasis supplied.)
In the instant case, not only were no contracts of sale consummated, but on the contrary the owners of the property are unwilling to sell at all to plaintiffs. No state action has been exerted in favor of defendants. Defendants are not seeking the aid or intervention of the courts to prevent plaintiffs from acquiring the property. To the contrary, it is plaintiffs who ask this court to compel defendants to dispose of their property against their will.
Parenthetically, we note that although there is no intimation in Shelley that the contracts in question were invalid even though unenforceable,[1] the present case does not involve any restrictive covenants or agreements between defendants and the ultimate purchasers of property in the subdivision prohibiting the sale of the property therein to Negroes. What we have presently before us is simply the initial refusal of the present owner of the property to sell his own property to a Negro. Cf. Corrigan v. Buckley, 271 U.S. 323, 330, 46 S.Ct. 521, 523, 70 L.Ed. 969, holding that "the prohibitions of the Fourteenth Amendment `have reference to State action exclusively, and not to any action of private individuals.' * * * `Individual invasion of individual rights *121 is not the subject-matter of the Amendment.' Civil Rights Cases, 109 U.S. 3, 11 [3 S.Ct. 18, 21, 27 L.Ed. 835]." The court further stated (271 U.S., l. c. 331, 46 S.Ct., l. c. 524) that "it is obvious * * * that while they (present sections 1981, 1982 and 1983, Title 42, U.S.C.) provide, inter alia, that all persons and citizens shall have equal right with white citizens to make contracts and acquire property they, like the Constitutional Amendment under whose sanction they were enacted, do not in any manner prohibit or invalidate contracts entered into by private individuals in respect to the control and disposition of their own property." It would appear, a fortiori, therefore, that these statutes do not compel an owner of private property to sell such property to any other person against his will, whatever the reason may be for his refusal.
Hampton v. City of Jacksonville, Florida, 5 Cir., 304 F.2d 320, involved two golf courses which the city had owned and operated for its residents. After an injunction prevented the city from operating these golf courses on a racially segregated basis, they were sold to private persons (on very favorable terms to the purchasers), each conveyance containing a reversionary clause ensuring that the property would continue to be used for the purpose of a golf course. The purchasers in each instance restricted the use of the golf courses to white persons only. An action was then brought to enjoin such restrictive operation.
In the court's view, the absolute obligation of the new owners of the property that they immediately, presently and always use the property for golf course purposes and no other, constituted "complete present control" by the City, and that the reservation of control in the reversionary clause involved the City "to the extent necessary to constitute such operation state action." Said the court, "So, too, where the City of Jacksonville, which has long been in the business of operating golf courses for its residents, elects to sell the golf courses, but only on condition that they continue to be used in such manner that the public will still enjoy their benefits in the same capacity, the city is permitting the private individual to perform this part of the City's function." The court rejected the argument that unlike a lease the case involved simply the sale of city property. Answering this argument the court said (304 F.2d l. c. 322), "Conceptually, it is extremely difficult, if not impossible, to find any rational basis of distinguishing the power or degree of control, so far as relates to the state's involvement, between a long-term lease for a particular purpose with the right of cancellation of the lease if that purpose is not carried out on the one hand, and an absolute conveyance of property, subject, however, to the right of reversion if the property does not continue to be used for the purpose prescribed by the state in its deed of sale."
Among the lease cases are Derrington v. Plummer, 5 Cir., 240 F.2d 922, Department of Conservation and Development v. Tate, 4 Cir., 231 F.2d 615, and Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45. In Derrington, the County constructed a new courthouse in which part of the basement was finished and equipped for use as a cafeteria. The cafeteria space was leased to Derrington to furnish cafeteria service for the benefit of persons having occasion to be in the County Courthouse. That is, the County undertook to furnish eating facilities to all persons without regard to race. Derrington refused to serve Negroes. The court held that under the facts the action of the lessee "may fairly be said to be conduct of the County and thus State action within the inhibition of the Fourteenth Amendment." The court noted that the courthouse had just been built with public funds for use by citizens generally, and this part of the basement had been planned, equipped and furnished by the County for use as a cafeteria. It was held that since the express purpose of the lease was to furnish services to people in the courthouse, it followed that "in *122 rendering such services the lessee stands in the place of the County," so that the lessee's "conduct is as much state action as would be the conduct of the County itself." Here, too, we see direct involvement by the County in a meaningful manner, in the use of public property, as contrasted to the entire want of any comparable involvement in the instant case as well as the completely private nature of defendants' property.
Boman v. Birmingham Transit Company, 5 Cir., 280 F.2d 531, invalidated a local bus company's rule requiring separate seating of Negroes and whites. A city ordinance expressly requiring separate seating was repealed, and at the same time a new ordinance was enacted authorizing the transit company to adopt seating rules and regulations and making the violation of such rules a criminal offense. The court found the requisite "state action", holding, "Where, as here, the City delegated to its franchise holder the power to make rules for seating of passengers and made the violation of such rules criminal * * * we conclude that the Bus Company to that extent became an agent of the State and its actions in promulgating and enforcing the rule constituted a denial of the (individual's) constitutional rights."
The Court pointed out that the right to use the public streets for hire is a special privilege, and that the issuance of a franchise to operate a bus line for transportation of passengers for hire is a governmental function. Said the court, "[T]he justification for the grant by a state to a private corporation of a right or franchise to perform such a public utility service as furnishing transportation, gas, electricity, or the like, on the public streets of the city, is that the grantee is about the public's business. It is doing something the state deems useful for the public necessity or convenience. This is what differentiates the public utility which holds what may be called a `special franchise,' from an ordinary business corporation which in common with all others is granted the privilege of operating in corporate form but does not have that special franchise of using state property for private gain to perform a public function." (Emphasis supplied.) In the instant case, defendants are not performing a public utility service, do not have a special franchise, and make no use of public property in the conduct of their business.
A leading Supreme Court case on the subject of state action is Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45. In that case, the court stated the applicable standard of interpretation of the Fourteenth Amendment as follows: "[P]rivate conduct abridging individual rights does no violence to the Equal Protection Clause unless to some significant extent the State in any of its manifestations has been found to have become involved in it." (Emphasis supplied.) The court carefully refrained from any attempt to fashion and apply a precise formula for recognition of state responsibility, stating this was an "impossible task". It was held that whether the state is sufficiently involved in private conduct can only be determined in each case by sifting facts and weighing the circumstances there presented.
In Burton, an automobile parking building had been constructed with public funds for public purposes and operated by a state agency. A restaurant which was physically and financially a part of this public building, but operated by a private person under lease, refused to serve a Negro. The court held that in view of all of the circumstances, the State must be considered as a joint participant in the operation of the restaurant and that the challenged conduct could not reasonably be considered to be "purely private", so as to fall without the scope of the Fourteenth Amendment. Said the court, (365 U.S., l. c. 726, 81 S.Ct., l. c. 862), "Specifically defining the limits of our inquiry, what we hold today is that when a State leases public property in the manner and for the purpose shown to have been the case here, the proscriptions of the Fourteenth Amendment must be complied with by the lessee as *123 certainly as though they were binding covenants written into the agreement itself."
In Simkins v. Moses H. Cone Memorial Hospital, 4 Cir., 323 F.2d 959, the issue presented was whether the activities of the hospital which participated in the Hill-Burton program ("with its massive financial aid and comprehensive plans") were sufficiently imbued with "state action" to bring them within the Constitutional prohibition against racial discrimination. That is, the question for determination was whether the state or federal government or both became so involved in the conduct of this otherwise private body that its activities were also the activities of these governments. The court answered this question in the affirmative, holding that it was controlled by Burton. Just as the Supreme Court in Burton "attached major significance to `the obvious fact that the restaurant is operated as an integral part of a public building devoted to a public parking service'", the court in Simkins found it significant "that the defendant hospitals operate as integral parts of comprehensive joint or intermeshing state and federal plans or programs designed to effect a proper allocation of available medical and hospital resources for the best possible promotion and maintenance of public health. Such involvement in discriminatory action `it was the design of the Fourteenth Amendment to condemn.'" 323 F.2d, l. c. 967. Discussing the Hill-Burton Act, the court found a congressional design therein to induce the States to undertake the supervision of the construction and maintenance of adequate hospital facilities throughout their territory rather than an intent simply to grant financial aid to individual hospitals. In this situation it was said, "Upon joining the program a participating State in effect assumes, as a State function, the obligation of planning for adequate hospital care. And it is, of course, clear that when a State function or responsibility is being exercised, it matters not for Fourteenth Amendment purposes that the * * * [institution actually chosen] would otherwise be private: the equal protection guarantee applies."
Smith v. Holiday Inns of America, Inc., 6 Cir., 336 F.2d 630, applying the law as it existed prior to the Civil Rights Act of 1964 (which "would plainly render defendants' policy of racial exclusion illegal"), held that the Fourteenth Amendment prohibited motel operators from refusing to accept Negroes as guests at a motel erected on land purchased in a city redevelopment project from the city housing authority. The court stated, "The single pervasive fact which defendants seek to ignore but which this court cannot is that this motel is part and parcel of a large, significant, and continuing public enterprisethe Capitol Hill Redevelopment Project." The court held that it was apparent that public funds of the city, state and federal government "were inextricably intermingled in the financing of the Capitol Hill Redevelopment Project. It is also obvious that that project was carried out by public agencies created by and operating under the laws of the United States and the State of Tennessee." Even though the fee was actually transferred (as distinguished from Burton which involved a lease), the court emphasized that in both cases "the basic plan, the financing, the land acquisition, the execution of the plan, the continuing supervision of the plan are all state actions under state law and through state agencies." (336 F.2d, l. c. 635). The major factors in the decision were "The public design, and the continuing public controls" over the project, as well as "the fact that part of the preconceived public design was to create a facility (a motel) which has service to the general public as its basic purpose." Holding that "the right not to have state finances, state agencies and state laws employed (for the purpose of banning some of the State's own citizens solely on the grounds of race) is a right encompassed in the Equal Protection Clause of the Fourteenth Amendment", the court ruled that the discrimination practiced by the defendants *124 was not purely private in character and was the product of state action. In the instant case, the subdivision is not part of a redevelopment project or other public enterprise or program, and no public funds are used to finance or aid the development. To the contrary, the project, in all its aspects, is purely private.
Plaintiffs also cite the cases involving voting rights in which the Supreme Court ruled against primary elections held by a political party which barred Negroes from participation. Aside from the fact that essentially these cases pertain to Fifteenth Amendment rights, we find them wholly inapplicable to the instant situation. The first of these cases, Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759, invalidated a Texas statute which barred the right of Negroes to vote in primary elections. Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, again invalidated Texas all-white primary elections on the ground that "state delegation to a party of the power to fix the qualifications of primary elections is delegation of a state function." It was held that the state could not avoid its duties by so setting up its electoral process that a private organization controlling a primary was permitted to practice racial discrimination.
Smith was implemented by Rice v. Elmore, 4 Cir., 165 F.2d 387, which held that even though all state laws provided for primary elections were repealed, nevertheless the action of the State in permitting a party to take over part of the election machinery could not operate to avoid the provisions of the Constitution forbidding racial discrimination in the elections which were clearly a state function.
And in Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, the Supreme Court held that the activities of the Jaybird Democratic Association "played a sufficient part" in the Democratic primary elections as to make its denial of the right of Negroes to vote in the Jay-bird primaries a denial of effective participation in the elective process in selecting the officials in the County concerned and thereby deprived citizens of voting rights because of their color in violation of the Fifteenth Amendment.
In these election cases what is held is that private groups are subject to constitutional restraints "when they perform functions of a governmental character in matters of great public interest." In Nixon v. Condon, 286 U.S. 73, 88, 52 S.Ct. 484, 487, 76 L.Ed. 984, it was pointed out that the defendants were "acting in matters of high public interest, matters intimately connected with the capacity of government to exercise its functions." "That is to say, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." Evans v. Newton, supra, (382 U.S., l. c. 299, 86 S.Ct., l. c. 488). We find no similar situation existent under the facts alleged in the complaint. No governmental power or functions are involved in the sale of private property, a lot in a private subdivision.
Another line of cases cited by plaintiffs deal with the utilization of trespass laws to enforce a state's policy of racial segregation. No doubt these cases are cited because in at least some of them the Supreme Court has discussed limitations upon the right of owners of private property. Our study of these cases has convinced us not only that they fail to support plaintiffs' position, but also that much of the discussion therein by the Justices of the Court would lead to the opposite conclusion. We briefly refer to some of these cases.
Lombard v. State of Louisiana, 373 U.S. 267, 83 S.Ct. 1122, 10 L.Ed.2d 338, simply held that where public officials had, in effect, determined that they would not permit Negroes to seek desegregated services in restaurants, the Court would not sustain the conviction of persons who refused to leave a restaurant in which they were denied service because of race. Plaintiffs' main reliance *125 is on the concurring opinion of Mr. Justice Douglas. However, what he primarily stressed was the fact that the penalty was imposed upon the defendants by the state judiciary and that such action was necessarily `state action'. Thus, "By enforcing this criminal mischief statute, invoked in the manner now before us, the Louisiana courts are denying some people access to the mainstream of our highly interdependent life solely because of their race." 373 U.S., l. c. 279, 83 S.Ct., l. c. 1128.
Plaintiffs' brief quotes extensively from the concurring opinion of Mr. Justice Douglas in Lombard. However, in their zeal to promote their own ends, plaintiffs have tailored his language in at least one instance by omitting an essential portion of the sentence quoted, so that the part quoted in their brief not only fails to fairly represent the thinking of Mr. Justice Douglas, but on the contrary has the effect of actually misrepresenting what he said. The complete sentence to which we refer is as follows: "But surely Shelley v. Kraemer, supra, and Barrows v. Jackson, [346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586], supra, show that the day has passed when an innkeeper, carrier, housing developer, or retailer can draw a racial line, refuse service to some on account of color, and obtain the aid of a State in enforcing his personal bias by sending outlawed customers to prison or exacting fines from them." 373 U.S., l. c. 280, 83 S.Ct., l. c. 1129. Plaintiffs omitted the portion we have italicized.
Plaintiffs are fully aware that this case does not involve an attempt by a "housing developer" to send his "outlawed customers" to jail or otherwise punish them with the help of the state. We seriously doubt whether Mr. Justice Douglas' reference to "housing developer" (which plaintiffs emphasize) has to do with a private subdivision developer, as distinguished from a public redevelopment project. In any event, nothing in the concurring opinion (which of course is no more than the expression of the views of one Justice) reasonably supports the position taken by plaintiffs.
Peterson v. City of Greenville, 373 U.S. 244, 83 S.Ct. 1119, 10 L.Ed.2d 323, is another sit-in demonstration case which involved the convictions under a state trespass statute of demonstrators who refused to leave the lunch counter areas after being denied service. State action was found in the fact that the City ordinance required segregated service and in the use of the state's criminal process to enforce such discrimination.
Bell v. State of Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822, is a recent sit-in demonstration case which gave rise to extensive discussion by various members of the Supreme Court. The demonstrators were convicted under Maryland trespass laws after refusing to leave a Baltimore restaurant. The majority of the court did not reach the merits of the case, remanding it to the State court for consideration of whether the convictions should be nullified in view of a superseding change in state law. In the concurring opinion of Mr. Justice Douglas, he pointed out that "We deal here with public accommodations with the right of people to eat and travel as they like and to use facilities whose only claim to existence is serving the public." (378 U.S., l. c. 247, 84 S.Ct., l. c. 1826). Again, Mr. Justice Douglas stressed that there was present in that case state judicial action (enforcement of trespass statutes) which is clearly state action, citing Shelley v. Kraemer, 334 U.S. 1, 20, 68 S.Ct. 836, 92 L.Ed. 1161. He noted that in Shelley there was no state statute which regulated the use of restrictive covenants either by expressly authorizing their use or administratively regulating the matter, so that "[o]nly the courts of the State were involved." Mr. Justice Douglas significantly added,
"At the time of the Shelley case there was to be sure a Congressional Civil Rights Act that guaranteed all citizens the same right to purchase and sell property `as is enjoyed by white citizens.' Id., 334 U.S. at 11, [68 S.Ct. at 841]. But the existence of that statutory right, like the existence of a right under the Constitution, is no criterion *126 for determining what is or what is not `state' action within the meaning of the Fourteenth Amendment. The conception of `state action' has been considered in the light of the degree to which a State has participated in depriving a person of a right."
In Mr. Justice Black's dissenting opinion, he expressed the view that the mere enforcement of a trespass statute was not of itself sufficient "state action" within the meaning of the Fourteenth Amendment. He distinguished Shelley v. Kraemer, stating, "It seems pretty clear that the reason judicial involvement of the restrictive covenants in Shelley was deemed state action was not merely the fact that a state court had acted, but rather that it had acted `to deny to petitioners, on the grounds of race or color, the enjoyment of property rights in premises which petitioners are willing and financially able to acquire and which the grantors are willing to sell.' 334 U. S., at 19 [68 S.Ct., at 845]. In other words, this Court held that state enforcement of the covenants had the effect of denying to the parties their federally guaranteed right to own, occupy, enjoy, and use their property without regard to race or color." (Emphasis supplied). Thus, the differences between Mr. Justice Douglas and Mr. Justice Black relate only to the effect and ultimate purpose of the judicial action taken in a particular case. Both are in essential agreement as to the necessity that the state courts affirmatively be involved in aiding those guilty of discriminatory practices where no state law or executive officers sanction such practices.
We believe Mr. Justice Black, although in dissent, fairly summarized the existing case law relating to property rights as follows:
"Thus, the line of cases from Buchanan through Shelley establishes these propositions: (1) When an owner of property is willing to sell and a would-be purchaser is willing to buy, then the Civil Rights Act of 1866, which gives all persons the same right to `inherit, purchase, lease, sell, hold, and convey' property, prohibits a State, whether through its legislature, executive, or judiciary, from preventing the sale on the grounds of the race or color of one of the parties. Shelley v. Kraemer, supra, 334 U.S., at 19 [68 S.Ct. at 845]. (2) Once a person has become a property owner, then he acquires all the rights that go with ownership: `the free use, enjoyment, and disposal of a person's acquisitions without control or diminution save by the law of the land.' Buchanan v. Warley supra, 245 U.S., at 74 [38 S.Ct. at 18]. This means that the property owner may, in the absence of a valid statute forbidding it, sell his property to whom he pleases and admit to that property whom he will; so long as both parties are willing parties, then the principle stated in Buchanan and Shelley protect this right. But equally, when one party is unwilling, as when the property owner chooses not to sell to a particular person or not to admit that person, then, as this Court emphasized in Buchanan, he is entitled to rely on the guarantee of due process of law, that is, `law of the land,' to protect his free use and enjoyment of property and to know that only by valid legislation, passed pursuant to some constitutional grant of power, can anyone disturb this free use." (378 U.S., l. c. 330-331, 84 S.Ct., l. c. 1871).
We examine the facts alleged in the first amended complaint for the purpose of determining whether under the authorities there is such involvement of the state as to constitute defendants' racially inspired refusal to sell their property to plaintiffs "state action".
We start with the admitted fact that the property involved is private property which belongs to defendants, or at least to one of them, and that plaintiffs have no property interest whatever therein. It is further incontrovertible, and the very basis of the action, that defendants are unwilling to contract with or to convey any property interest to plaintiffs. This fact immediately distinguishes the case from Shelley v. Kraemer, *127 and other similar cases, which involved the validity of agreements affecting the rights of a willing seller to deal with a willing buyer and to validly transfer an interest in property.
The property involved in this case was neither leased nor sold by the state or county to plaintiffs. Hence, the right to use public property or facilities is not involved. There is no claim that defendants have accepted any governmental appropriations in aid of their subdivision development. It is incontrovertible that the development is not part of a redevelopment project undertaken by governmental agencies or financed to any extent with public funds. These facts clearly distinguish this case from Hampton, Derrington, Burton, Smith, Simkins, and similar authorities.
Significantly, plaintiffs have carefully refrained from alleging that the subdivision in which they seek to purchase a home is aided by any federally insured financing, and it is clearly implied from the complaint that both the subdivision in question as well as the defendant country club are and will be privately financed, and not involved in any form of federal aid or financial assistance. For such reason Executive Order No. 11063, to the extent it might otherwise be applicable, is without any meaningful significance. In attempting to evade this issue plaintiffs have alleged that other subdivisions which were promoted by defendants and which adjoin the subdivision in question have been financed by loans from the Federal Housing Association, and that the subdivision here in question is part of an overall "community" which has been provided by defendants, at least in part by loans insured by the credit of the federal government. However, what defendants may have done in promoting other subdivisions cannot add to plaintiffs' rights with respect to the subdivision here in question, and certainly not with respect to the specific house and lot therein they seek to purchase.
It is plaintiffs' theory as set forth in the complaint that defendants are not simply proposing to sell just a house, but rather "they are building a community" in which, so they claim, "the state is involved from beginning to end, including the licensing of the Defendants to engage in business, the zoning of the property, the building and maintenance of streets, sewers, and other public facilities, the enforcement of covenants running with the land to control the continuing use, maintenance, and development of the project."
This "involvement" is set forth in meticulous detail in the complaint as follows: (1) The corporate defendants have been granted the "privilege" of operating in corporate form. So, too, are all other corporations chartered by the State of Missouri. (2) Defendants are licensed to engage in business and have made use of the services of numerous other businesses which are licensed and regulated by the state, such as plumbers, electricians, banks and the like. So, too, do many other private enterprises. The mere fact defendants are licensed by the state to carry on their occupations does not of itself involve the state in the operation of their business. In the words of Mr. Justice Black, dissenting in Bell v. State of Maryland, 378 U.S. 266, 333, 84 S.Ct. 1814, 1872, "Businesses owned by private persons do not become agencies of the State because they are licensed; to hold that they do would be completely to negate all our private ownership concepts and practices." (3) Defendants are "protected" in their operations by various state laws and local organizations, in particular zoning laws, banking and lending laws and numerous laws affecting the transfer and development of real property. Whatever this conclusionary allegation may mean, it is evident that the laws referred to are general in their application and confer no special privileges upon defendants. (4) In numerous ways, "the state with its political subdivisions and other administrative agencies, `contribute' to the conduct of defendants' businesses, including the following: the plans of defendants to accomplish the building of *128 homes must be approved by the Building Commissioner, the Metropolitan Sewer District has furnished and will furnish sewer services to the subdivision, the responsibility for zoning and an overall land use plan is committed to the Planning Commission of St. Louis County and the St. Louis County Council, all transfers of property as well as trust indentures which will embody future restrictions on the use of the subdivision either are or will be recorded in the Office of the Recorder of Deeds, other offices such as the Traffic Department, Highway Department and County Engineer" are available and contribute the time and resources of the County of St. Louis and State of Missouri to the success of defendants' venture, education for the children of families living in the subdivision are provided by a school district which receives assistance and funds from the State and the taxpayers of the County and State, the Union Electric Company, a licensed utility of the state supplies electricity and electrical equipment to homes in the subdivision, and in addition certifies the homes as "Medallion Homes" which permits the defendants to profit therefrom, and defendants also receive the benefits of services from Laclede Gas Company, another licensed utility company, subject to regulation by the State Public Service Commission.
We see no significant state involvement in any of the foregoing allegations, giving them the most liberal intendment. Public utilities must furnish services to all who qualify, and may not refuse service on the ground that the customer has discriminated against others. In Hackley v. Art Builders, Inc., D.C.Md., 179 F.Supp. 851, 856 it was said, "Most apartment home owners and owners of private houses throughout the State receive water and sewage disposal service from public corporations. This does not make such owners subject to the same rules as public corporations, or publicly controlled corporations." As to the allegations that the state is involved in the zoning and land use regulations, it is, of course, obvious that these regulations are restrictions upon defendants' right to use their land as they choose. Aside from being general in application, such regulations do not confer any rights upon the defendants by the state, but instead take away some of their rights in the exercise of the state's police powers.
The availability of educational facilities to families of purchasers of the property, as well as the availability of various state and county offices in no way involve the state in the conduct of defendants' business. These are facilities and rights available to all citizens without discrimination, and do not in any way aid or abet defendants in the conduct complained of.
Plaintiffs place great stress upon their conclusionary allegations that the subdivision development will be a "complete community", their theory being that it follows therefrom that all the conduct of defendants is comparable to a municipal corporation and subjects them to the same proscriptions as a true municipality. Thus, they urge that defendants intend to and will construct and maintain streets for use by the public in general, much as does a municipality, and that they intend to impose restrictive covenants in the deeds of conveyance which will authorize assessments for street maintenance, garbage collections, and other services similar to those provided by municipalities. Plaintiffs argue that defendants will thereby be invested with governmental powers. It is, of course, true that whenever private individuals are empowered to exercise governmental functions (as in the voting cases, supra), they are subject to the same constitutional and statutory limitations upon the exercise of such powers as the government itself. But the complaint herein does not touch upon any conduct of defendants which could fairly be said to be an exercise of a governmental function.
Even if it be assumed (and no case so holds) that when a state "permits" (mainly in the sense it does not prohibit) a private person to build *129 streets on his own property and to make contracts which authorize assessments against abutting owners for their maintenance, the private person is thereby carrying on a state function, it does not follow therefrom that the sale of his property also becomes a state function.
It may well be that once streets are built, parks set aside and garbage collection provided for by defendants, the residents of this subdivision will be entitled to utilize these services on a nondiscriminatory basis. But this is not the question before us. However this question may be answered, plaintiffs have no present right to compel defendants to convey private property to them.
In stressing the fact that streets will be constructed by the defendants, the case of Marsh v. State of Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265, is cited. Marsh involved the exercise of the right of free speech on a privately owned street in public use. The Supreme Court held that "[o]wnership (of property) does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."
Here, plaintiffs make no contention either that they are or will be barred from using the streets which defendants will build and maintain or which the trustees to be named in the future will maintain. Defendants have never sought in any way to limit plaintiffs' peaceful or constitutionally authorized activities on the privately owned streets or sidewalks of the subdivision. Yet, it is only the streets which are or will be opened by defendants for use by the public in general. There is no reasonable basis for contending that the lots owned by defendants on which houses have been or will be constructed abutting the private streets are intended to be used by the public in general. To the contrary, although defendants do solicit the public through advertisements and otherwise in order to obtain purchasers therefor, and such purchasers will be members of the general public, nevertheless the house and lot in each instance is intended to be used only by the individual purchaser thereof.
In all the sit-in demonstration cases in which Marsh was either cited or followed, it is evident that the property the court had reference to (in connection with the alleged trespassing) was the property on which the businessman was conducting his business, the very property which he opened up to the public for use in connection with his business activities. It followed therefrom that the businessman did not necessarily have a right to the assistance of the state in evicting from his property a person who entered thereon as a member of the public seeking to obtain the very service which he provided therein.
There is no allegation in the first amended complaint that plaintiffs have been evicted from the place of business operated by defendants, nor that either of them was arrested, nor that the state in any way used its judicial branch for the purpose of aiding defendants in discriminating against them. The state has not intervened to assist defendants. When all is said and done, the complaint clearly demonstrates that defendants did no more than politely refuse to enter into a contract of sale with plaintiffs. The actions of defendants are neither required nor affirmatively sanctioned by the state. It has maintained a policy of strict neutrality. Even in the sit-in demonstrations there is no intimation that (prior to the Civil Rights Act of 1964) the proprietors of the restaurants would have been subject to a damage action for refusing to serve the demonstrators. All that the Supreme Court held in these cases is that the state could not aid or participate in such refusal. (Of course with the passage of the Civil Rights Act of 1964, the situation insofar as places of public accommodation are concerned has been changed).
Taking as the crucial test of state action the actuality of state involvement, we find that under the facts well pleaded *130 there has been no such involvement as to make the acts of the defendants herein state action. What we have here is individual action. Defendants are not here seeking judicial enforcement of any discriminatory restrictive covenant. If the defendants' refusal to sell their privately owned property to plaintiffs is violative of any right of plaintiffs, their remedy is not in this court. In the absence of federal legislation dealing with the problem, this court has no jurisdiction to redress plaintiffs' alleged grievances.
The Civil Rights Act of 1964 does not confer any right of action upon a person with whom a property owner refuses to contract for the sale of his property. Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258, sustained the 1964 Act on the "basis of the commerce clause." The court stated that the applicability of that Act "is carefully limited to enterprises having a substantial relation to the interstate flow of goods and people, except where state action is involved." Except in situations involving state action, the Civil Rights Act of 1964, insofar as here relevant, pertains to places of public accommodation. We note that Mr. Justice Black in his concurring opinion (379 U.S., l. c. 278, 85 S.Ct., l. c. 369), referring to his dissenting opinion in Bell, supra, says that what he there stated was only that "the Fourteenth Amendment in and of itself, without any implementation by a law passed by Congress, does not bar racial discrimination in privately owned places of business in the absence of state action." And Mr. Justice Douglas in his concurring opinion (379 U.S., 280, 85 S.Ct., 370) also referring to his concurring opinion in Bell, supra, states that his position is that "the right to be free of discriminatory treatment (based on race) in places of public accommodationwhether intrastate or interstateis a right guaranteed against state action by the Fourteenth Amendment and that state enforcement of the kind of trespass laws which Maryland had in that case was state action within the meaning of the Amendment." He also called attention to the definition of "state action" in the Civil Rights Act of 1964, which defines it, inter alia, as discrimination "enforced by officials of the state."
Neither the Commerce Clause nor the nature of plaintiffs' employment confer upon them any additional rights to compel an unwilling seller to convey his property to them in the absence of a statute so requiring. Atlanta Motel would not have been decided as it was but for the explicit provisions of the Civil Rights Act of 1964. The determination of when and the circumstances under which interstate commerce is to be regulated is initially for the Congress, not the Courts. Unless and until Congress acts, there is no need (and indeed, no right) for us to determine whether a federal fair housing act would constitute a valid exercise of the right of Congress to regulate commerce between the states. It is sufficient, for present purposes, that such legislation has not been enacted.
Plaintiffs do not contend that the state has given any affirmative support whatever to defendants' racially discriminatory practices. The case presented is that of a property owner who has for reasons of his own declined to convey a part of his property to a person seeking such a conveyance.
Neither the fact that defendants own more than one parcel of property, nor the fact that the various parts of the property are being offered for sale to others as part of an overall plan to which the State in any of its manifestations is not a party, does not alter the basic question we here answer in the negative, namely, Does this court have the power either to compel defendants to transfer title to their property against their will or to be answerable for damages for their refusal to do so?
We hold that under present law, plaintiffs' first amended complaint fails to state a claim over which this court has jurisdiction. Defendants' motion to dismiss must be and is hereby sustained.
NOTES
[1] The reverse is true, "We conclude, therefore, that the restrictive agreements standing alone cannot be regarded as a violation of any rights guaranteed to petitioners by the Fourteenth Amendment. So long as the purposes of those agreements are effectuated by voluntary adherence to their terms, it would appear clear that there has been no action by the State and the provisions of the Amendment have not been violated." (334 U.S., l. c. 13, 68 S.Ct., l. c. 842).