380 Mich. 405 (1968)
157 N.W.2d 213
BEECH GROVE INVESTMENT COMPANY
v.
CIVIL RIGHTS COMMISSION.
Calendar No. 42, Docket No. 51,869.
Supreme Court of Michigan.
Decided April 1, 1968.
*411 Hartman, Beier, Howlett & McConnell, for plaintiffs.
Frank J. Kelley, Attorney General, Robert A. Derengoski, Solicitor General, and Carl Levin, Assistant Attorney General, for defendant.
Amici Curiae:
American Civil Liberties Union of Michigan, by Rolland R. O'Hare, Chairman, Erwin B. Ellman, General Counsel, and Norton J. Cohen, Legal Director.
Anti-Defamation League of B'Nai, B'Rith and National Committee against Discrimination in Housing, by Jacob I. Alspector, Nelson S. Chase, G. Vernon Leopold, Ronald M. Rothstein, Arnold Forster, Sol Rabkin, Joseph B. Robison, Paul Hartman, and Abraham H. Foxman.
Michigan State Conference of the National Association for the Advancement of Colored People, by Stuart J. Dunnings, Jr.
Michigan Catholic Conference, Jewish Community Council of Metropolitan Detroit, and Michigan Council of Churches, by Ramon S. Regan, Louis Rosenzweig, and Alvin A. Neller.
New Detroit Committee, by Frank E. Cooper.
*412 ADAMS, J.
I. THE FACTS AND PROCEEDINGS.
In 1964, Freeman M. Moore, a 38-year-old Negro, lived with his wife and two children in Inkster, Michigan. He had served nine years as a science teacher in the Ecorse high school before becoming a counselor, in which capacity he had served two years. He held three college degrees  a bachelor's degree from Springfield College, a master's degree in public health from Columbia University, and a master's degree in counseling and guidance from Eastern Michigan University. His wife was a nurse anesthetist at Metropolitan Hospital, Detroit.
Freeman Moore became interested in the Georgetown Green subdivision, owned by plaintiff Beech Grove Investment Company, through an advertisement in the Detroit Free Press. The advertisement is reproduced herein. After driving through the subdivision, he called the telephone number listed in the ad and requested a brochure and other information. He received the brochure in March, 1964, and discussed the possibilities with his wife. In May, 1964, the Moores decided not to investigate further because Mrs. Moore felt the Georgetown Green subdivision might become a tension area.
In September, 1964, a brochure and letter were mailed to Freeman Moore relating to the development of North Georgetown Green subdivision. The brochure recreated the Moores' interest. Mr. Moore called the sales manager. He had several conversations with him and was mailed a plat plan of the subdivision. On one occasion, not being able to reach the manager, his call was transferred to Mr. Frank Schell, a salesman. In October, 1964, Moore told Schell by telephone that they were interested in Lot 146 in the North Georgetown Green subdivision. Later, he was informed that Lot 146 had been
*413 
sold. He then indicated interest in Lot 148. Schell advised Moore that Lot 148 would be reserved for him. The next day Moore and his wife obtained a check from a credit union in the amount of $1,000, payable to William J. Pulte, Inc., and forwarded it to Schell. Moore received a deposit agreement *414 naming William J. Pulte, Inc., as seller, signed by Schell, acknowledging receipt of the $1,000 toward the purchase of Lot 148. Moore returned a signed copy of the deposit agreement to Schell. In doing so, he wrote a letter outlining his understanding, from telephone conversations with Schell, of the procedure to be followed for the purchase of the lot and construction of a house.
Beech Grove Investment Company, a Michigan corporation, owned land in Oakland county, Michigan, adjacent to 13-Mile road between Lahser and Telegraph roads. The land had been platted into three subdivisions  Georgetown Green subdivision, Lincolnshire Forest subdivision, and Georgetown Green No 2 subdivision (sometimes called North Georgetown Green).
William J. Pulte and William J. Pulte, Inc., a Michigan corporation, were licensed builders. The corporation held itself out as "Master Builders." William J. Pulte was the president of both Beech Grove Investment Company and William J. Pulte, Inc. The first vice-president, second vice-president, secretary, treasurer, and assistant treasurer were the same persons, respectively, in the two corporations. The registered offices of the corporations were the same.
Beech Grove Investment Company had no salesmen. The corporate purpose of William J. Pulte, Inc., was to build residential housing. In its newspaper advertisements and in its posted signs it quoted prices as covering the cost of house and lot. Pulte testified that when his company put such advertisements in the paper, stating that the price quoted included the lot, he assumed Beech Grove Investment Company would go along with the deal and sell the lot. William J. Pulte, Inc., had no contract with Beech Grove Investment Company. Beech Grove Investment Company would not sell *415 any of its lots in the Georgetown subdivisions unless the purchaser contracted with Pulte to build the house. Pulte, Inc., would build a house for an owner on a lot not purchased from Beech Grove Investment Company.
In connection with its activities in the Georgetown subdivisions, William J. Pulte, Inc., maintained two offices in Lincolnshire Forest subdivision, which subdivision adjoined Georgetown Green subdivision. These offices were conducted in portions of model homes that had been built on Lots 1 and 2 of Lincolnshire Forest subdivision. Accounting and administrative functions were conducted from the office on Lot 1 and sales from Lot 2.
Shortly after receipt of the deposit agreement, Pulte began checking on the Moores. Michael Pulte, a brother of William Pulte, went to the Ecorse high school on October 27, 1964, and contacted Freeman Moore for the first time. He asked for a meeting at the building company's office. One was set for October 29, 1964. An attempt at the hospital was made to check on the identity of Mrs. Moore.
On October 29, 1964, at 7:30 p.m., the Moores met with William Pulte in his office on Lot 1 in Lincolnshire subdivision. Pulte, Baranska  the sales manager, the Moores, and a friend of the Moores  a Dr. Courtney  were present. The testimony of Pulte, in part, before the civil rights commission, about the meeting was as follows:
"Q. Did you tell Mr. Moore in your meeting of October 29, 1964, that if you sold a lot to him it would hurt sales?
"A. I don't recall exactly how I put it. I said if I sold him a lot it wouldn't be advantageous to the subdivision from our business standpoint.
"Q. Was there any other reason why you wouldn't sell to a Negro besides that?
"A. No.
*416 "Q. So the decision not to sell to a Negro was plain and simple business and economics, wasn't it?
"A. That is correct.
"Q. Just a matter of profit.
"A. That is correct."
On examination by his attorney, William J. Pulte said:
"I told Mr. Moore that he had a cross in life and it was the color of his skin."
Pulte returned the Moores' $1,000 check by letter dated November 3, 1964. Moore testified that at no time was he asked or was inquiry made by the Pultes as to his financial ability to buy.
Freeman M. Moore complained to the civil rights commission. The commission, by an amended complaint, issued on its own behalf on October 26, 1965, proceeded against Beech Grove Investment Company, William J. Pulte, Inc., and William J. Pulte personally. Answer to the amended complaint was filed by the respondents on November 18, 1965. A public hearing before three hearing commissioners was held in Pontiac, Michigan, on November 30, 1965. Findings of fact, dated January 19, 1966, were filed by the hearing commissioners and approved by the civil rights commission at its public meeting on January 25, 1966. On February 8, 1966, the civil rights commission issued a cease and desist order against the respondents in which it found that discrimination against Negroes on their part violated:
"a. The civil right of claimant to purchase property for housing purposes regardless of his race, as guaranteed by the Constitution and laws of the State of Michigan, and
"b. The Michigan public accommodations act (Act 328, Public Acts of 1931, as amended, CL *417 1948, §§ 750.146-750.148, Stat Ann 1962 Rev §§ 28.343-28.345)."[*]
A complaint was filed on February 28, 1966, in the Oakland county circuit court by respondents as plaintiffs against the civil rights commission, seeking a trial de novo and a quashing of the cease and desist order of the commission. Answer to the complaint was filed by the attorney general on March 11, 1966. On August 22, 1967, Governor George Romney, pursuant to Michigan General Court Rule 797, requested the Supreme Court to authorize the circuit court of Oakland county to certify to this Court controlling questions of public law involved in the case pending before that circuit court. An order of the Supreme Court accepting certification of one controlling question was entered on October 3, 1967.
II. THE CERTIFIED QUESTION.
The question so certified reads as follows:
"Is the civil rights commission possessed of jurisdiction, absent enabling legislation, to entertain complaints of discrimination, because of religion, race, color, or national origin, in the purchase and sale of private housing?"
III. JURISDICTION OF THE CIVIL RIGHTS COMMISSION.
The Michigan civil rights commission came into existence by virtue of article 5, § 29, of the 1963 Michigan Constitution. It reads as follows:
"There is hereby established a civil rights commission which shall consist of eight persons, not more than four of whom shall be members of the *418 same political party, who shall be appointed by the governor, by and with the advice and consent of the senate, for four-year terms not more than two of which shall expire in the same year. It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination. The legislature shall provide an annual appropriation for the effective operation of the commission.
"The commission shall have power, in accordance with the provisions of this constitution and of general laws governing administrative agencies, to promulgate rules and regulations for its own procedures, to hold hearings, administer oaths, through court authorization to require the attendance of witnesses and the submission of records, to take testimony, and to issue appropriate orders. The commission shall have other powers provided by law to carry out its purposes. Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state.
"Appeals from final orders of the commission, including cease and desist orders and refusals to issue complaints, shall be tried de novo before the circuit court having jurisdiction provided by law." (Emphasis supplied.)
From a reading of the above section, it is evident that it brought into being a constitutionally created body with certain powers and authority set forth in the section and with other powers and authority to be "provided by law." The committee on style and drafting of the constitutional convention of 1961 made a distinction in the use of the words "prescribed by law" and the words "provided by law." Where "provided by law" is used, it is intended *419 that the legislature shall do the entire job of implementation. Where only the details were left to the legislature and not the over-all planning, the committee used the words "prescribed by law." See 2 Official Record, Constitutional Convention of 1961, pp 2673, 2674.
It must be concluded that the duty of the commission to investigate alleged discrimination and to secure the equal protection of civil rights without such discrimination was created by the constitutional provision itself. The manner may be prescribed by law but the authority to act lies with the commission whether the manner is or is not so prescribed.
The second paragraph gives the commission certain procedural powers, after which that paragraph states: "The commission shall have other powers provided by law to carry out its purposes [emphasis supplied]." In the grant of such other powers, the task is left to the legislature.
While the commission has the duty to investigate and to secure the equal protection of civil rights, such civil rights are not set forth in article 5, § 29. The source of such civil rights is designated as "the civil rights guaranteed by law and by this constitution." Possible sources of such civil rights are: Federal law arising out of either Federal statutes or the Constitution of the United States; Michigan law arising out of State statutes or the common law of the State; and the 1963 Michigan Constitution.
A. Federal Law.
It is claimed that a civil right to purchase property is guaranteed by the Thirteenth Amendment to the United States Constitution and statutes passed pursuant thereto, particularly the civil rights *420 act of 1866 and later re-enactments of the same. Similar claims were made in the case of Jones v. Alfred H. Mayer Company (1966), 255 F Supp 115. District Judge John K. Regan, in a lengthy opinion, carefully considered such claims and concluded that under present Federal law the same could not be sustained. Upon appeal to the Court of Appeals for the 8th Circuit (1967), 379 F2d 33, a 3-judge panel affirmed the decision of the district judge. The facts in that case are as follows (p 35):
"The plaintiffs, Joseph Lee Jones, and Barbara Jo Jones, are husband and wife. Joseph Lee Jones is a Negro. Both are Federal employees and Missouri citizens. The defendants, four in number, are Alfred H. Mayer Company, a corporation engaged in the business of developing subdivisions in Saint Louis county, Missouri, and of constructing homes to be sold to the public; Alfred Realty Co., a Missouri licensed corporate real estate broker acting as the exclusive sales agent for Mayer houses; Alfred H. Mayer who owns the controlling interest in both corporations, who is their managing officer, and who also is licensed by Missouri as a real estate salesman; and Paddock Country Club, Inc., a corporation controlled by the other defendants `for the primary use and benefit of the people in' Paddock Woods, a subdivision which the defendants are presently developing.
"In June 1965 plaintiffs were looking for a new home and, in consequence of an advertisement in the St. Louis Post-Dispatch, went to Paddock Woods, picked up a brochure describing the development there, and inspected display homes on the site. They determined that a certain style of house suited their needs and resources and was reasonably accessible to their places of employment. According to the defendants' promotional material this house could be built and sold for $28,195. The plaintiffs selected a lot as their first choice among those available in the subdivision. The defendants, through their *421 agents, `refused to consider plaintiffs' application to purchase a house and to enter into a contract for the sale of a house and lot, because Joseph Lee Jones is a Negro, and it is defendants' general policy not to sell said houses and lots to Negroes'.
"The complaint also recites: Paddock Woods includes more than 100 projected homes, with more plats to be opened. The ultimate result will be a suburban community of about a thousand people `living in an area chosen by defendants for development, residing in homes designed and built by defendants, driving on streets built by defendants, playing golf on the nearby 18-hole course built by defendants for the convenience of residents of [this and other nearby subdivisions developed by defendants], and enjoying the facilities of the nearby bath and tennis club which defendants plan to open * * * for the exclusive use of residents of Paddock Woods'.
"The complaint further alleges State and municipal involvement by the Missouri incorporation of the three corporate defendants; the protection afforded the defendants `by various State laws and local ordinances, in particular zoning codes, building codes, banking and lending laws, and numerous laws effecting the transfer and development of real property'; the approval of plans by the county building commissioner; the furnishing of sewer service by the metropolitan district; the responsibility of the planning commission for zoning; the county recording of transfers and restrictions; the availability of the traffic and highway departments and the county engineer; the education of children in a tax supported school district; and the furnishing of electric and gas services by State licensed utilities. It is also alleged that Paddock Woods is `enlarged' by the defendants' other nearby developments `all of which are financed by loans insured by the Federal Housing Administration'."
*422 Circuit Judge Blackmun, writing for the Court of Appeals, stated (p 44):
"It would not be too surprising if the Supreme Court one day were to hold that a court errs when it dismisses a complaint of this kind. It could do so by asserting that section 1982 was, because of its derivation from the Thirteenth Amendment, free of the shackles of State action despite what has been said in Hurd v. Hodge (1948), 334 US 24 (68 S Ct 847, 92 L ed 1187). It could do so by asserting that, even though section 1982, because of its reenactment, was subject to Fourteenth Amendment limitations, we nevertheless have, on the accepted facts here, enough to constitute State action in the light of the expanding concept of that term. And it could do so on the ground, suggested in Guest,[**] that State action is no longer a factor of limitation and that Congress has acted through section 1982 to reach private discrimination in housing.
"We feel, however, that each of these approaches, at the present time, falls short of justification by us as an inferior tribunal. The Thirteenth Amendment approach has been made hazy and obscure by the 1870 reenactment and by the pronouncements in Hurd v. Hodge. The Fourteenth Amendment approach still carries the condition of State action. And the governmental function approach finds little helpful majority precedent in a legion of decided cases. Those where relief has been granted involve factual elements of far greater depth and significance than are present here. On this complaint we do not even have the thin gloss of governmental agency mortgage service in Paddock Woods."
On December 4, 1967, 389 US 968 (88 S Ct 479, 19 L ed 2d 459), petition for writ of certiorari to the United States Supreme Court was granted. The case is now before that Court with oral argument to be heard on April 2, 1968. Decision of the United *423 States Supreme Court presumably will follow before the end of that Court's present term. A definitive decision dealing with the Federal questions may be handed down by the United States Supreme Court in the near future. Federal legislation dealing with the problem may also be enacted.
In 1952, The Unhappy History of Civil Rights Legislation by Eugene Gressman was published in the Michigan Law Review (50 Mich L Rev 1323 [1951-52]). In the opening paragraph of his article Mr. Gressman stated p 1323:
"The enforcement by Federal legislation of the constitutional rights of individuals is a story written largely in terms of confusion, distortion, and frustration. Seldom, if ever, have the power and the purposes of legislation been rendered so impotent. Indeed, this story constitutes one of the saddest chapters in the historic struggle to effectuate the American ideal of freedom and equality for all."
After reviewing Federal civil rights legislation and the adoption of the Thirteenth, Fourteenth, and Fifteenth Amendments, Mr. Gressman depicts the judicial destruction of the intended civil rights in The Slaughter-House Cases (1872), 16 Wall (83 US 36, 21 L ed 394); United States v. Cruikshank (1875), 2 Otto (92 US 542, 23 L ed 588); Virginia v. Rives (1879), 100 US 313 (25 L ed 667); United States v. Harris (1882), 106 US 629 (1 S Ct 601, 27 L ed 290); and The Civil Rights Cases (1883), 109 US 3 (3 S Ct 18, 27 L ed 835), and states p 1342:
"The inevitable effect of these decisions was to transfer back to the States the prime responsibility for the protection of basic civil rights, a result which the legislators of 1866 to 1875 had expressly sought to prevent. The south was thereby enabled to create and perpetuate its rigid rules of segregation. Lynchings, race riots, and other forms of unequal treatment were permitted to abound in the south *424 and elsewhere without power in the Federal government to intercede. The nation in fact entered upon an era of constitutional law, which Justice Harlan had feared, `when the rights of freedom and American citizenship cannot receive from the nation that efficient protection which heretofore was unhesitatingly accorded to slavery and the rights of the master.'"
Much has transpired since 1952 to give recognition to Federal civil rights. It is not unlikely that the recognition of those rights will continue to be expanded. The Court of Appeals recognized this in its opinion in Jones, supra. While we are not bound by that decision and might indeed make our own re-examination of Federal law in the light of recent and pending developments, we do not deem this to be necessary. Fortunately, our Michigan history with regard to civil rights is quite unlike the Federal struggle as will be shown in the balance of this opinion. Consequently, it is concluded that the Michigan civil rights commission does not presently have authority from either Federal law or the Federal Constitution to secure the equal protection of a civil right in private housing.
B. State Statutory Law.
There is presently no State law that deals with civil rights as pertaining to private housing. The Michigan legislature, though called into special session in 1967 by Governor Romney for the purpose of enacting fair housing legislation and though presently in its 1968 session considering such legislation, has not as yet enacted any legislation to create or define civil rights in private housing. Such legislation, even if enacted, would be beyond the certified question which is specifically restricted to consideration of the jurisdiction of the Michigan civil rights commission "absent enabling legislation."
*425 C. The 1963 Michigan Constitution.
Article 5, § 29, speaks of "civil rights guaranteed * * * by this constitution [emphasis supplied]." The last sentence of article 1, § 4  the freedom of worship and religious belief section  reads:
"The civil and political rights, privileges and capacities of no person shall be diminished or enlarged on account of his religious belief."
The second sentence of article 8, § 2, which deals with elementary and secondary schools, reads:
"Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin."
Article 11, § 5, which provides for State civil service, contains this sentence in the 5th paragraph:
"No appointments, promotions, demotions or removals in the classified service shall be made for religious, racial or partisan considerations."
None of the above provisions defines a civil right and only article 1, § 4, uses the words "civil * * * rights." While the provisions are not unimportant in their particular context, it is obvious that their primary purpose is not to guarantee civil rights to be secured by the civil rights commission but, rather, to reaffirm freedom of religion or to interdict discrimination by government itself in a specific governmental activity.
The debates of the Constitutional Convention and the Address to the People conclusively establish that the civil rights guaranteed in this Constitution which are to be secured procedurally by the civil rights commission as provided in article 5, § 29, are the substantive "civil rights" of article 1, § 2, which reads:
*426 "No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation."
The committee on declaration of rights, suffrage and elections, submitted proposal 26 which subsequently became article 1, § 2, to the Constitutional Convention. Roger C. Cramton, in his article The Powers of the Michigan Civil Rights Commission, 63 Mich L Rev 5, 9 (Nov 1964), summarized that submission as follows:
"The committee report accompanying committee proposal 26 referred to the `impressive and moving testimony' of Delegate John Hannah, a member of the committee who was also chairman of the United States commission on civil rights, and of other individuals who appeared before the committee. The committee felt that an anti-discrimination declaration was necessary `to protect Negroes and other minorities against discrimination in housing, employment, education and the like.' `Civil rights' were not defined in detail; rather, the legislature was to define their scope, limits, and sanctions. The report, however, did indicate areas of principal concern: `As Mr. Hannah stated in his paper to the committee, "Civil rights as used herein means guarantees to protect against discrimination and segregation because of race, color, religion, ancestry or national origin." * * * The principal but not exclusive, areas of concern are equal opportunities in employment, education, housing, and public accommodations.'"
Proposal 26 (article 1, § 2) was submitted to the convention on February 1, 1962. It was approved after lengthy discussion. A minority proposal to *427 spell out civil rights in "employment, housing, public accommodations, education" was rejected, it being maintained that the broad phraseology of the section was sufficient.
Article 5, § 29, was not considered until a later date, final adoption occurring on August 1, 1962. Again an effort was made to spell out specific civil rights in that section. The effort was defeated largely because it was maintained that such rights had been provided for in article 1, § 2.
The constitutional debates on these provisions are lengthy. Many differences on the subject existed among the delegates and were expressed by them. Individual delegates fought hard for a statement of their own convictions in the single corporate expressions of the convention which finally were adopted.
The Address to the People contains the following explanation of article 1, § 2:
"This is a new section. It protects against discrimination because of religion, race, color or national origin in the enjoyment of civil and political rights and grants equal protection of the laws to all persons. The convention record notes that `the principal, but not exclusive, areas of concern are equal opportunities in employment, education, housing and public accommodations.'
"The legislature is directed to implement this section by appropriate legislation and the proposed constitution establishes a civil rights commission in the article on the executive branch." (Emphasis supplied.) 2 Official Record, Constitutional Convention of 1961, p 3363.
But it is the Constitution, not the debates, that was finally submitted to the people. While the debates may assist in an interpretation of the Constitution, neither they nor even the Address to the People is controlling. Nowhere does the Constitution *428 of 1963 set forth a specific civil right in private housing. Only an overriding classification is stated  "No person shall * * * be denied the enjoyment of his civil * * * rights or be discriminated against in the exercise thereof because of religion, race, color or national origin." The legislature is mandated to implement the section by appropriate legislation, i.e., to define and delineate a person's civil rights. The words are left undefined in the Constitution. The enjoyment of civil rights is guaranteed and the civil rights commission is instructed to secure that guarantee.
Although the 1963 Constitution is now in its fifth year, the Michigan legislature has not defined the meaning of the words "civil rights" as pertaining to housing. In the context of the facts of this case and the special question before us it is necessary that we consider the constitutional guarantee of civil rights as it pertains to private housing. Since such civil rights merge with the common-law meaning of the same, we defer that consideration to a discussion of the common law.
D. The Common Law.
We have seen that the 1963 Michigan Constitution does not attempt to define particular civil rights. It does mandate the enactment of legislation for the protection of civil rights, and it does forbid discrimination against any person in the exercise of his civil rights because of religion, race, color or national origin. The present status of the common law with regard to a civil right in private housing remains to be considered. We consider the question not in the abstract but in the context of the facts of this case. The consideration of certified questions is a departure from the case-by-case method of deciding questions of law which *429 has been the foundation and strength of our judicial system. To the extent that consideration of the factual background of a certified question contributes to an understanding of the forces in contention in a specific adversary situation, the factual background has been considered. See City of Gaylord v. Gaylord City Clerk (1966), 378 Mich 273.
It is generally agreed that two of the most significant features of the common law are: (1) its capacity for growth and (2) its capacity to reflect the public policy of a given era. It is stated as follows in 15 Am Jur 2d, Common Law, § 2, pp 795, 796, 797:
"The inherent capacity of the common law for growth and change is its most significant feature. Its development has been determined by the social needs of the community which it serves. It is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society, and adapting itself to the gradual change of trade, commerce, arts, inventions, and the needs of the country. The fact that no case remotely resembling the one at issue is uncovered does not paralyze the common-law system, which is endowed with judicial inventiveness to meet new situations.
"It is said that public policy is the dominant factor in the molding and remolding of common-law principles to the high end that they may soundly serve the public welfare and the true interests of justice. Furthermore, the social and economic mutations need not be purely evolutionary changes in customs, usages, and industrial practices; they may spring from legislation which has given direction to our social development, though in the beginning such enactments were not designed to supplant the common law outside the range of their specific application. Statutes, including those of recent origin, play a part in the formation of the common law, *430 and like court decisions that are not strictly analogous, sometimes point the way into other territory when the animating principle is used as a guide."
The following statement is set forth in 15A CJS, Common Law, § 2, pp 43, 44:
"The common law does not consist of definite rules which are absolute, fixed, and immutable like the statute law, but it is a flexible body of principles which are designed to meet, and are susceptible of adaptation to, among other things, new institutions, public policies, conditions, usages and practices, and changes in mores, trade, commerce, inventions, and increasing knowledge, as the progress of society may require. So, changing conditions may give rise to new rights under the law, and, also, where the reason on which existing rules of the common law are founded ceases, the rules may cease to have application."
Justice O'HARA in Myers v. Genesee County Auditor (1965), 375 Mich 1, 7, wrote:
"The common law, by Constitution, is the law of our State:
"`The common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force, until they expire by their own limitations, or are changed, amended or repealed.' Const 1963, art 3, § 7.
The meaning of the article is readily discernible. The common law as well as statutes abide unless `changed, amended or repealed.' `Amendment' and `repeal' refer to the legislative process. `Change' must necessarily contemplate judicial change. The common law is not static, fixed and immutable as of some given date." (Emphasis supplied.)
The public policy of this State with regard to discrimination and its influence on the common law can be deduced from: (1) the public policy ab initio; *431 (2) the public policy in Michigan cases; (3) the public policy in Michigan statutes; and (4) the public policy in the 1963 Michigan Constitution.
(1) The Public Policy in Michigan ab initio.
Michigan never did tolerate slavery. Even before statehood, the Northwest Ordinance forbade slavery and it has been forbidden in every Michigan Constitution. It was never necessary, in Michigan, to adopt provisions such as the Thirteenth and Fourteenth Amendments to the United States Constitution or the Civil Rights Acts of 1866 and 1870 to confer equality upon the Negro in the ownership of property. Such a disability to own property never existed in Michigan.
This is not to say that disabilities are unknown to our law. At one time aliens could not enjoy the same rights and privileges in property as citizens of Michigan. The disabilities of coverture also existed. But no provision in a Michigan Constitution has ever been required to confer equality upon the Negro to own property along with other citizens of the State. The colored male citizen could always own property on an equal footing with the white male citizen.
(2) The Public Policy in Michigan Cases.
In Ferguson v. Gies (1890), 82 Mich 358, the facts are stated in the Court's opinion as follows:
"The defendant, at and before the time this suit was brought, was the manager of a public restaurant in the city of Detroit, and was licensed by that municipality to conduct such public restaurant. It was to all intents and purposes a public place. On August 15, 1889, the plaintiff, a colored man, in company with a friend, entered this restaurant, and, sitting down at one of the tables provided for that purpose, ordered supper. The plaintiff claims, in substance, that the restaurant was divided in two *432 parts, not separate rooms, but one side or part of the room was known as the `restaurant side,' and the other as the `saloon side.' The restaurant side was furnished with tables, covered with tablecloths. Glasses were on the tables, with napkins in them, and there was an electric fan over the tables. The tables had a very neat appearance. The tables on the saloon side were furnished with beer glasses, and were beer tables such as are usually found in saloons. The plaintiff testifies that he and his friend sat down on the restaurant side at the first table from the last in the second row, and called for a lunch. The waiter said: `I can't wait on you here.' Ferguson said: `What do you mean by that?' The waiter replied:
"`We cannot serve you kind of people here. It is against the rules of the house to serve colored people in the restaurant. If you want anything to eat, you will have to go on the other side of the house.'
"After waiting a few minutes Ferguson went to the office, and said to the defendant, `Mr. Gies, I came into your restaurant with a friend, and I have been insulted by one of your waiters,' and told him what the waiter had said. Gies replied:
"`That is all right. That is the rule of this house, if you want anything to eat.'
"They had some conversation, which ended by defendant saying to plaintiff that he would get nothing to eat unless he went on the other side. Plaintiff asked if he could not sit at the table adjoining, or at any of the tables behind him, which were empty, but the defendant refused to serve him at any of the tables on that side of the room. Plaintiff went away without eating anything. While he was sitting at the table, several white persons came in, sat down, and had refreshments at different tables on the restaurant side of the house.
"The defendant admits that he refused to serve refreshments of any kind to the plaintiff at the *433 table where he sat, for no other reason than that Ferguson was a colored man, and that he said to him:
"`That is the rule of the house. We cannot serve colored people right at those certain tables.'
"But he testifies that he further said:
"`Ferguson, there is no use in your waiting here. We cannot serve you at these tables. If you will sit over at the next table in the other row, I will see that you are served there all right, the same as any other person will be.'
"Ferguson said, `No.' There was about six feet between the two rows of tables. Defendant admits also that there was a difference in the tables, being of different shape; that the tables at which he told Ferguson he might be served were at the time uncovered; and that the covers were taken off to accommodate the crowd that came in for beer; but testifies that he told plaintiff he would cover the table, and furnish it the same as the one he was sitting at, and that he should be waited upon and served the same as those on the other side of the room. Defendant denies that this was in the saloon part of his place. He says it was a part of the restaurant, but situated in a more private place, as the bar would hide them from the view of those in the front part of the place. There was no partition between the tables. They were in the same room, and divided only by space. Colored people were not permitted to sit except in one part of the room, but white men were served wherever they liked."
In that case the Court said (p 365):
"The common law as it existed in this State before the passage of this statute, and before the colored man became a citizen under our Constitution and laws, gave to the white man a remedy against any unjust discrimination to the citizen in all public places. It must be considered that, when this suit *434 was planted [1890], the colored man, under the common law of this State, was entitled to the same rights and privileges in public places as the white man, and he must be treated the same there; and that his right of action for any injury arising from an unjust discrimination against him is just as perfect and sacred in the courts as that of any other citizen. This statute is only declaratory of the common law, as I understand it now to exist in this State." (Emphasis supplied.)
When Gies undertook to conduct a public business, he did so subject to the requirement that the business be carried on without "unjust discrimination." Ferguson's remedy, even though statutorily stated, stemmed from the common law. Ferguson's right was the right not to be discriminated against because of religion, race, color or national origin. As a corollary of that right he was entitled to receive the same treatment anyone else would receive  no better, no worse.
(3) The Public Policy in Michigan Statutes.
The public policy with regard to civil rights in laws enacted by the legislature has been to ban discrimination. It has been summarized in The Powers of the Michigan Civil Rights Commission, supra, as follows (pp 25, 26):
"Other civil rights relating to racial, religious, and ethnic discrimination have been created by the legislature over the past hundred years. The first civil rights legislation was enacted in 1867; it prohibited racial segregation in public education. In 1869, a statute prohibited life insurance companies that were doing business within the State from making any distinction or discrimination between white and colored persons. The ban against miscegenation was removed in 1883. In 1885, criminal sanctions were provided for denial of equal treatment in public places of accommodation, amusement, and *435 recreation; racial discrimination in the selection and qualification of jurors was prohibited in the same year. The Michigan Supreme Court rejected the `separate but equal' doctrine in 1890, and held that a civil action for damages could be brought for discriminatory treatment in a public accommodation. The public accommodations statute was strengthened in 1937, 1952, and 1956; the 1952 amendment extended coverage to `government housing.' Finally, in 1955, the fair employment practices act created `a civil right' in `the opportunity to obtain employment without discrimination because of race, color, religion, national origin or ancestry' and established remedies for the enforcement of this right. Domestic help and employers with less than eight employees were excluded from the coverage of the act."
(4) The Public Policy with Regard to Civil Rights in the 1963 Michigan Constitution.
The capstone of Michigan public policy with regard to civil rights is the 1963 Michigan Constitution. Its provisions have been examined under section "C" of this opinion and need not be re-examined here. It is sufficient simply to say that over and over again discrimination based upon "religion, creed, race, color or national origin," discrimination for "religious, racial or partisan considerations," discrimination because of "religion, race, color or national origin" is forbidden. This means simply that men and women and children are not subject to classification as Negroes, Episcopalians, Jews, or Frenchmen under our system of laws or even in private undertakings of a magnitude to affect the public.
Beech Grove Investment Company, et al., held themselves out to the public in their business of offering for sale lots and houses for private housing by numerous advertisements in Detroit's metropolitan *436 newspapers and by signs at their subdivisions. They were in business to make a profit by selling lots and houses. Michigan employers are forbidden to discriminate in their employment practices. Businesses offering public accommodations may not pick and choose to whom those accommodations will be offered. The barber who offers his services must serve the public without discrimination. The examples could be multiplied.
Based on the facts of this case, we conclude that there is a civil right to private housing both at common law and under the 1963 Michigan Constitution where, as in this case, that housing has been publicly offered for sale by one who is in the business of selling housing to the public. Freeman Moore, like Ferguson in Ferguson v. Gies, supra, as a member of the public is entitled to the same treatment and consideration as anyone else  no better, but no worse; and Beech Grove Investment Company, et al., like Gies in the Ferguson Case were obligated by reason of the public nature of their enterprise to treat all members of the public alike. No opinion is presently expressed upon the question of whether there is a civil right to private housing where that housing has been publicly offered for sale by one who is not in the business of selling housing to the public, or by his representative.
No costs, a public question being involved.
T.M. KAVANAGH, O'HARA, and BRENNAN, JJ., concurred with ADAMS, J.
SOURIS, J.
The question we certified[1] for our opinion in this matter reads as follows:
*437 "Is the civil rights commission possessed of jurisdiction, absent enabling legislation, to entertain complaints of discrimination, because of religion, race, color, or national origin, in the purchase and sale of private housing?"
The facts are stated in Mr. Justice ADAMS' opinion as is his conclusion that the civil rights commission presently does have jurisdiction over complaints of such discrimination in the purchase and sale of private housing at least when it is alleged that the discriminatory acts have been committed by one in the business of selling housing to the public. He expressly reserves stating an opinion whether the commission's jurisdiction extends to complaints of such discrimination by others in the purchase and sale of private housing.
Justice ADAMS plants his conclusion upon two quoted sentences from Ferguson v. Gies (1890), 82 Mich 358, 365, to the effect that at common law in Michigan a citizen had a remedy against any "unjust discrimination" in "public places". From this, he reasons that citizens have a civil right against such discrimination in public places; that, since plaintiffs offered their services and products to the public, they were conducting a "public business" which, at common law, they had a duty to conduct without "unjust discrimination"; and, therefore, that any complaint of discrimination by them because of religion, race, color, or national origin invokes the jurisdiction of the civil rights commission by virtue of article 5, § 29 of our Constitution of 1963. Considering the very narrow foundation upon which he builds to his conclusion, his restricted expression of opinion is understandable, but nonetheless it is unacceptable to me in the light of the much broader statement of the question we ourselves formulated and ordered certified for our opinion.
*438 Article 5, § 29, quoted in its entirety in Justice ADAMS' opinion, provides pertinently:
"It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination." (Emphasis added.)
At the threshold of our inquiry is the question, what are "the civil rights guaranteed by law and by this constitution"? That also was a question which troubled at least some of the delegates to the constitutional convention, as the very extensive debates on the subject vividly disclose. Professor Roger C. Cramton, of the University of Michigan Law School, in his article, "The Powers of the Michigan Civil Rights Commission", 63 Mich LR 5, reviews much of the recorded history of this controversy. But that history, fascinating as it is in its revelations of the competing forces influencing the decisions made at the convention, does not help us answer the threshold question posed, simply because, as my Brother ADAMS notes, the debates were ended without defining expressly in article 5, § 29 the nature of the civil rights so grandly guaranteed. Instead, the delegates proposed, and the people adopted, the language above quoted which refers us to other sections of the Constitution and to other law for definition of the civil rights guaranteed. The other law to which article 5, § 29 refers us includes not only State law, constitutional, statutory, and judicial, but, as well, Federal law.
42 USC § 1982 provides as follows:
"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed *439 by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."
It is my opinion that that Federal statute elevated to the rank of civil right the right, among others listed, to purchase real property, and that that civil right exists in Michigan as in every other State and territory of the United States.
It was in the Civil Rights Cases (1883), 109 US 3 (3 S Ct 18, 27 L ed 835), that the United States Supreme Court described the right to purchase property as one of the fundamental rights of citizenship. The Supreme Court held that denial by the owner of an inn, a public conveyance, or a theater, of its accommodations and privileges to an individual because of his race or color, without sanction therefor in State law, did not inflict upon such individual any manner of servitude, or badge of slavery, which Congress could forbid under authority of the Thirteenth or Fourteenth Amendments to the United States Constitution. However, the Supreme Court distinguished carefully between such rights of public accommodation, which were among those it said might be called "the social rights of men and races in the community", and "those fundamental rights which appertain to the essence of citizenship, and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery", namely, the right, among others, to purchase property. Id., p 22.
Whether there is general agreement today over the distinction between "social rights" and "fundamental rights" drawn by the Supreme Court in the Civil Rights Cases, there can be no disagreement that, under Federal law, the right to purchase property is one of the fundamental rights of citizenship beyond the power of the States to deny to any citizen *440 of the United States. Mr. Justice Bradley described the nature of those rights this way in his opinion for the Supreme Court in the Civil Rights Cases (p 22):
"The long existence of African slavery in this country gave us very distinct notions of what it was, and what were its necessary incidents. Compulsory service of the slave for the benefit of the master, restraint of his movements except by the master's will, disability to hold property, to make contracts, to have a standing in court, to be a witness against a white person, and such like burdens and incapacities, were the inseparable incidents of the institution. Severer punishments for crimes were imposed on the slave than on free persons guilty of the same offenses. Congress, as we have seen, by the civil rights bill of 1866, passed in view of the Thirteenth Amendment, before the Fourteenth was adopted, undertook to wipe out these burdens and disabilities, the necessary incidents of slavery, constituting its substance and visible form; and to secure to all citizens of every race and color, and without regard to previous servitude, those fundamental rights which are the essence of civil freedom, namely, the same right to make and enforce contracts, to sue, be parties, give evidence, and to inherit, purchase, lease, sell and convey property, as is enjoyed by white citizens. Whether this legislation was fully authorized by the Thirteenth Amendment alone, without the support which it afterward received from the Fourteenth Amendment, after the adoption of which it was re-enacted with some additions, it is not necessary to inquire. It is referred to for the purpose of showing that at that time (in 1866) Congress did not assume, under the authority given by the Thirteenth Amendment, to adjust what may be called the social rights of men and races in the community; but only to declare and vindicate those fundamental rights which appertain to the essence of citizenship, and *441 the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery."
The importance of section 1982 and Justice Bradley's discussion of its 1866 predecessor lies only in the fact that, as a matter of Federal law, there exists in this State the civil right to purchase property. Whether the Federal law protects that right against deprivation by private individuals or only against denial by State action, see Hurd v. Hodge (1947), 334 US 24 (68 S Ct 847, 92 L ed 1187), is of no significance to my opinion. I rely upon the Federal law as the source of a civil right our own State Constitution makes it the duty of the civil rights commission to protect against discriminatory denial, by any person or by the State, because of religion, race, color or national origin.[2] Thus, I find that one of "the civil rights guaranteed by law" in this State is the Federal right of citizenship to purchase property; that neither any private person nor the State itself lawfully may discriminate against any person because of religion, race, color or national origin in the enjoyment of that civil right; and that it is the duty of the civil rights commission to investigate complaints of such discrimination and to secure the equal protection of that civil right without discrimination.
The case of Jones v. Alfred H. Mayer Company (1967, CA 8), 379 F2d 33, certiorari granted, 389 US 968 (88 S Ct 479, 19 L ed 2d 459), presents no obstacle to my opinion. In that case Judge Blackmun was dealing with the assertion that plaintiffs were entitled to judicial relief from discriminatory *442 treatment (very similar to that endured by Mr. and Mrs. Moore) by virtue of section 1982 itself and not by virtue of any State law which incorporated by general reference the civil rights guaranteed by other laws, like section 1982, as does article 5, § 29 of our Constitution. It is one thing to say, as did Judge Blackmun, that section 1982 does not provide a Federal remedy for deprivation by a private person, absent State action, of another's civil rights guaranteed by that statute; it is quite another thing to say, as I do, that section 1982, as construed by the Supreme Court in the Civil Rights Cases, supra, establishes a fundamental right of citizenship in the United States, a civil right, "to inherit, purchase, lease, sell, hold, and convey real and personal property" and that that civil right is protected against discriminatory denial, by anyone, because of religion, race, color or national origin, not by Federal law, but, rather, by article 5, § 29 of our own State Constitution.
This is not to suggest that article 5, § 29, by its reference to "the civil rights guaranteed by law", incorporates within its reach all legally protected interests, as hypothesized and then rejected by Professor Cramton in his article above cited. Article 5, § 29 imposes a duty upon the civil rights commission to protect against discriminatory denial only those rights, civil rights, which are of the magnitude of fundamental rights of citizenship and of the essence of civil freedom. The opinion of the Supreme Court in the Civil Rights Cases, supra, made this distinction in apodictic language. While one might disagree with the Supreme Court's placement of its line of distinction, it cannot be disputed that the Supreme Court regarded at least the rights granted by section 1982 as so fundamental that they were of the essence of civil liberty and, therefore, qualitatively distinguishable from those other rights *443 Congress sought to protect which the Supreme Court described as "social rights".
Professor Robert J. Harris, of the University of Michigan Law School, writing on "Open Occupancy" in the December 1967 issue of The Detroit Lawyer (p 177), expresses a concern that courts, construing constitutional language pertaining to civil rights, might not be able to draw the lines of distinction between permitted and prohibited conduct, particularly in private housing transactions, with as fine a brush as could a legislature. I share his concern and, therefore, add these words of limitation upon the views I have expressed above: we confront in this case only the discriminatory refusal to sell a private dwelling, not the discriminatory refusal to rent a living unit in an owner-occupied dwelling. While willing to concede at least the possibility that other constitutional interests may be involved in the latter, "tight living" situation, as described by Professor Harris, there have been no other constitutional interests suggested for otherwise limiting my opinion as it applies to the purchase and sale of private dwellings.
It is not inappropriate to note, in conclusion, that legislative action, perhaps in fulfillment of the Constitution's article 1, § 2 mandate to the legislature, during the five years since adoption of our 1963 Constitution might have served our citizens' needs better than we are able to serve them judicially without such legislation. Certainly, such legislation could have resolved at least some of the problems which remain unanswered by our opinions of this date.
BLACK, J. (dissenting).
The question certified under GCR 1963, 797 reads as follows:
"Is the civil rights commission possessed of jurisdiction, absent enabling legislation, to entertain *444 complaints of discrimination, because of religion, race, color, or national origin, in the purchase and sale of private housing?"
Reading the 2 interrelated constitutional sections[*] together, as I think we should, it seems intentionally clear that the civil rights commission cannot entertain complaints without the aid of that legislation which each section requires. To "entertain" a complaint means something more than reception thereof for filing pending enactment of necessary enabling legislation. It includes the processing of such a complaint according to not yet provided implementation "by appropriate legislation" and "powers provided by law."
*445 The key sentences in the two sections are "The legislature shall implement this section by appropriate legislation." (art 1, § 2) and "The Commission shall have other powers provided by law to carry out its purposes." (art 5, § 29). Without such implementation and powers the commission cannot "entertain," cannot hear, and cannot determine.
My answer to the quoted question is "No."
DETHMERS, C.J., and KELLY, J., concurred with BLACK, J.
NOTES
[*] Amended by PA 1956, No 182.  REPORTER.
[**] United States v. Guest (1966), 383 US 745 (86 S Ct 1170, 16 L Ed 2d 239).  REPORTER.
[1] GCR 1963, 797.
[2] See McKibbin v. Corporation & Securities Commission (1963), 369 Mich 69, for a prior unsuccessful effort by a State agency to prohibit discriminatory conduct because of race, color, religion, national origin or aneestry, by licensed real estate brokers and salesmen. It was decided before the effective date of our Constitution of 1963.
[*] (Art 1, § 2, Const 1963) "Sec. 2. No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation."

(Art 5, § 29, Const 1963) "Sec. 29. There is hereby established a civil rights commission which shall consist of eight persons, not more than four of whom shall be members of the same political party, who shall be appointed by the governor, by and with the advice and consent of the senate, for four-year terms not more than two of which shall expire in the same year. It shall be the duty of the commission in a manner which may be prescribed by law to investigate alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by law and by this constitution, and to secure the equal protection of such civil rights without such discrimination. The legislature shall provide an annual appropriation for the effective operation of the commission.
"The commission shall have power, in accordance with the provisions of this constitution and of general laws governing administrative agencies, to promulgate rules and regulations for its own procedures, to hold hearings, administer oaths, through court authorization to require the attendance of witnesses and the submission of records, to take testimony, and to issue appropriate orders. The commission shall have other powers provided by law to carry out its purposes. Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state.
"Appeals from final orders of the commission, including cease and desist orders and refusals to issue complaints, shall be tried de novo before the circuit court having jurisdiction provided by law."